# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff/Counter-Defendant,

vs.                                  No. CIV 12-0434 JB/GBW

GILBERT BORREGO,

      Defendant/Counter-Claimant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant/Counter-Claimant's Motion for Order to Show Cause and to Enforce Settlement Agreement, filed September 28, 2023 (Doc. 99)("Motion").  The Court held a hearing on November 28, 2023.  <u>See</u> Clerk's Minutes (dated November 28, 2023), filed November 28, 2023 (Doc. 109).  The primary issue is whether the Court should hold the Plaintiff/Counter-Defendant United States of America in contempt and sanction the United States for violations of the Court's Consent Judgment, filed May 11, 2015 (Doc. 95)("Consent Judgment"), for failing to transfer a 1.4-acre parcel of property to Defendant/Counter-Claimant Gilbert Borrego once Borrego had "fulfilled all his obligations under the Consent Judgment."  Motion at 1.  The Court denies the Motion, because it concludes that the provisions which Borrego seeks to enforce through the Court's contempt power are not part of the Consent Judgment, but rather part of a settlement agreement between the parties that led to the Consent Judgment; and, because the Court concludes that the terms of the settlement agreement are not incorporated into the Consent Judgment, the Court may not enforce the settlement agreement's terms through the Court's contempt power.

## FACTUAL BACKGROUND

For the purposes of this opinion, the Court provides the following general overview of this case's factual background.  These facts are taken from the United States' Complaint for Trespass & Ejectment, Damages, Unlawful Enclosures and Occupancy, and Injunctive Relief, filed April 25, 2012 (Doc. 1)("Complaint"), and thus reflect the United States' version of events. These facts are provided solely for background.

The core factual allegations are that Borrego trespassed on certain United States-owned property that lies within Rio Arriba County, New Mexico.  Complaint ¶ 8, at 2.  Specifically, the Complaint alleges that Borrego

> has constructed or allowed to be constructed structures that encroach onto the site; constructed, allowed to be constructed and/or maintained fencing or other enclosures which obstruct or enclose portions of the United States' property; deposited or allowed to be deposited vehicles, vehicle parts and other personal property and materials onto the site; placed and/or grazed livestock on the site; and disturbed and destroyed natural land features and vegetation on the site. Defendant has used and continues to use the site.

Complaint ¶ 8, at 2.  In essence, the United States alleges that -- since "at least 1998," Complaint ¶ 18, at 4 -- Borrego has used property belonging to the United States for his own purposes, including building structures and storing property.

## PROCEDURAL BACKGROUND

In this Procedural Background section, the Court first summarizes the pleadings and then provides greater detail regarding the Consent Judgment.  Next, the Court describes the Motion's arguments.  The Court then discusses a hearing held before the Court on October 12, 2023, at which the parties discussed the United States' Motion for Extension of Time to Respond to Motion for Order to Show Cause and to Enforce Settlement Agreement, filed October 11, 2023 (Doc. 100), and also agreed on certain procedural adjustments related to the Motion.  The Court then discusses the United States' arguments in the United States' Response to Motion for Order

to Show Cause and to Enforce Settlement Agreement, filed November 13, 2023 (Doc. 106)("Response"), and Borrego's subsequent Reply in Support of Motion for Order to Show Cause and to Enforce Settlement Agreement, filed November 27, 2023 (Doc. 107)("Reply"). Last, the Court describes the arguments at the hearing on the Motion that the Court held on November 28, 2023.

1.      <u>**The Complaint, Litigation, and Consent Judgment.**</u>

In 2012, the United States filed its Complaint. <u>See</u> Complaint at 1. The Complaint's core factual allegations are that Borrego trespassed on certain United Stated-owned property that lies within Rio Arriba County, New Mexico. On the basis of these factual allegations, the United States asserts one count of trespass, <u>see</u> Complaint ¶¶ 17-20, at 3-4, one count of Debt Owed to the United States, <u>see</u> Complaint ¶¶ 21-24, at 4, and one count of Unlawful Inclosures and Occupancy of Public Land, <u>see</u> Complaint ¶¶ 25-29, at 5, and seeks injunctive relief to "prevent or abate" Borrego's allegedly unlawful conduct, Complaint ¶ 33, at 5, and to prevent him from "using or occupying the site without authorization or permit," Complaint (A), at 6. The United States also seeks a writ of ejectment, and damages Borrego's conduct caused. <u>See</u> Complaint (E), (G), at 6. Borrego answered the Complaint and asserted counterclaims against the United States on June 25, 2012. <u>See</u> Defendant's Answer & Counterclaim, filed June 25, 2012 (Doc. 6)("Answer"). Borrego asserted various affirmative defenses to the Complaint and also asserts a quiet title claim. Answer ¶¶ 15-32, at 3-5. <u>See</u> <u>id.</u> ¶¶ 47-48, at 9-10.

After nearly three years of litigation, the parties notified the Court that they "agree and consent to a judgment" as set forth in the Consent Judgment. Consent Judgment at 1. The Consent Judgment states that the Consent Judgment is "hereby entered against Defendant GILBERT BORREGO in favor of the United States of America on the Complaint filed in this

case, and JUDGMENT be and it hereby is entered against Defendant/Counterclaimant GILBERT

BORREGO and in favor of the United States of America on the Counterclaim filed herein."

Consent Judgment at 1.  The Consent Judgment states that the stipulated judgment therein is

made "pursuant to a Settlement Agreement executed by the parties."  Consent Judgment at 1.

Beyond this introductory commentary, the Consent Judgment contains a series of

stipulations that deal with the property upon which is the subject of the Complaint -- i.e., it

explains what is to become of the property that the United States alleges Borrego trespassed.  See

Consent Judgment at 1-4.  Specifically, the Consent Judgment states that title to that property --

which the Consent Judgment references as the "subject property" or "Tract 24" -- is "forever

quieted in favor of the United States of America," and that Borrego "shall execute any and all

documents deemed necessary by the United States of America to affirm same [sic], including by

not limited to quitclaim deed(s) and/or disclaimer(s) of interest."  Consent Judgment at 1-2.  The

Consent Judgment also provides that Borrego shall no longer use the property for the purposes of

building structures or storing his property, see Consent Judgment at 2, and that all property,

fixtures, and livestock on the property may be relocated or demolished at the United States'

expense, see Consent Judgment at 2, and the United States will not be liable to Borrego for any

damage that this relocation or demolition causes, see Consent Judgment at 2.  Relatedly, the

United States will have no responsibility to store, reassemble, or restore any of the property,

fixtures, debris, structures, or other materials removed from the property, and the United States

may sell these materials, with proceeds from such sales first going to cover the cost of the

demolition or relocation, and with remaining monies to be paid to Borrego.  See Consent

Judgment at 3.  The Consent Judgment also gives a timeline -- ninety days -- for Borrego to

discontinue services to the property.  See Consent Judgment at 3.  The Consent Judgment also

states that Borrego is to "cooperate fully, and not interfere in any way, with the United States' demolition, removal, transportation, impoundment, remediation, sale and disposition efforts." Consent Judgment at 3.  The Consent Judgment also allows the United States "immediate and complete access" for the purposes of surveying, as well as the aforementioned demolition and removal processes, to the property, as well as to adjacent property that Borrego owned.  <u>See</u> Consent Judgment at 3.  The final sentence of the main body of the Consent Judgment states: "Further, notwithstanding anything to the contrary herein, the United States shall not remove any personal property, including fences on the portion of Tract 24 to be proposed for sale in the Settlement Agreement, unless the Settlement Agreement has been breached."  Consent Judgment at 4.

The final sentences of the Consent Judgment read as follows:

This Consent Judgment is entered pursuant to the terms of the attached Settlement Agreement executed by the parties.  In order to resolve any disputes that may arise during the performance of this Consent Judgment, this Court retains jurisdiction over this case during the period in which this Consent Judgment will be performed.

Consent Judgment at 4.

## 2.   <u>The Motion</u>.

Borrego's Motion asks the Court: (i) to issue an Order to Show Cause, which would require the United States to show cause why the Court should not adjudge the United States in contempt and sanction the United States for violations of the  Consent Judgment, <u>see</u> Motion at 1; (ii) to "enforce the settlement agreement," which he asserts is "attached to and incorporated into the Consent Judgment," Motion at 1; and (iii) for sanctions and attorney's fees, <u>see</u> Motion at 1.  Borrego begins his Motion by laying out his understanding of the Consent Judgment's requirements and obligations.  By Borrego's recounting, the Consent Judgment is the fruit of

"extensive settlement negotiations," Motion at 1, and was executed "in consideration of the mutual promises and obligations" set forth therein, Motion at 2 (quoting Consent Judgment at 8). The thrust of Borrego's understanding is that the Consent Judgment is the manifestation of the settlement of the parties' prior dispute, and that settlement "was consistently referred to and explained as an exchange of two parcels." Motion at 2. According to Borrego, in this exchange Borrego would "grant" the United States a forty-acre parcel within the Rio Grande del Norte National Monument in Taos County ("Taos Property"), and the United States would "convey" to Borrego a 1.4-acre parcel of property that lies adjacent to property that Borrego owns in Rio Arriba County ("1.4-Acre Parcel"). Motion at 2. Under this exchange's terms -- as Borrego sees it -- "costs would be stipulated, shared and mitigated." Motion at 2 (citing Clerk's Minutes for Hearing held November 19, 2014, Before The Honorable Gregory B. Wormuth, United States Magistrate Judge for the District of New Mexico at 1, filed November 19, 2014 (Doc. 70); Clerk's Minutes for Hearing Held December 10, 2014, Before Magistrate Judge Wormuth at 1-2, filed December 10, 2014 (Doc. 72)). Borrego states that the "convey[ance]" of the 1.4-Acre Parcel to him would be undertaken "pursuant to the process outlined in 43 C.F.R. Subpart 2710, **subject to the terms and conditions of**" the Consent Judgment. Motion at 2 (quoting Consent Judgment at 9[1])(emphasis in Motion, but not in Consent Judgment). Borrego quotes the Settlement Agreement:

---

[1]Although the Court uses the shorthand "Consent Judgment" to refer to Doc. 95 as a whole, Doc. 95 contains the Consent Judgment, see Consent Judgment at 1-5, and also other exhibits, one of which is the document titled "Settlement Agreement," Consent Judgment at 8-15. The Motion frequently cites to the Settlement Agreement and refers to the cited material as part of the Consent Judgment. In the Analysis section of this opinion, the Court analyzes whether the Settlement Agreement is part of the Consent Judgment. For now, for the purposes of the Court's procedural background section, the Court follows Borrego's citation convention of referring to all parts of Doc. 95 as "Consent Judgment," but flags that all citations to pages 8-15 of Doc. 95 are not citations to the Consent Judgment, but rather to the Settlement Agreement. To

> Paragraph 1(d) of the 2015 Agreement states that "[a]ny and all transaction costs incurred by the United States in the direct sale process and the acceptance of the" 40-acre Taos Property will be "shared between the parties" and that "such costs assumed and paid by Borrego will in no event exceed $15,000."

Motion at 2 (quoting Consent Judgment at 15).  Borrego then notes that the Consent Judgment "also specifies dates for the performance of its terms."  Motion at 2.  In short, Borrego reads the Consent Judgment as a contract with "clear terms," Motion at 2, which describe an "exchange of two parcels," Motion at 2, in which "costs would be stipulated, shared and mitigated," Motion at 2.

Despite what he describes as this agreement's "clear terms," Motion at 2, Borrego alleges that BLM has not only "failed to fulfill its obligations" under the Consent Judgment, Motion at 2-3, but also that BLM now expects Borrego to pay for the 1.4-Acre Parcel at the cost of an "appraised fair market value of $14,000," Motion at 3 (quoting Letter from Pamela Mathis to Gilbert Borrego at 2 (dated June 1, 2023), filed September 28, 2023 (Doc. 99-1)("June 1 Letter")).  Borrego also asserts that BLM now attaches various conditions to his prospective ownership of the 1.4-Acre Parcel, such as requiring Borrego "to submit 'a Color-of-Title Application[,]' which 'will be subject to the terms and conditions' and certain 'reservations, restrictions' including 'a right-of-way for ditches and canals' and a mineral estate."  Motion at 3 (quoting June 1 Letter at 2-3).  Borrego contends that he then attempted in good faith to resolve the matter by sending -- through counsel -- a letter to the BLM, only to receive a response which imposed "**additional requirements for Mr. Borrego to complete the direct sale**."  Motion at 4 (quoting Letter from Mia Napolitano to Tierra Marks at 2 (dated August 18, 2023), filed

---

emphasize this distinction, when the Motion quotes or cites from pages 8-15 of Doc. 95, the Court will -- in the main text -- signal that the text comes from the Settlement Agreement.

September 28, 2023 (Doc. 99-3)("August 18 Letter"))(emphasis in Motion, but not in August 18 Letter).[2]

Against this background, Borrego then forwards his legal arguments in support of his Motion.  See Motion at 4-17.  He begins with the premise that the Consent Judgment is both a court order and an agreement between the parties.  Motion at 4.  Citing McClendon v. City of Albuquerque, No. CIV 95-0024 JAP/KBM, 2016 WL 9818311, at *5 (D.N.M. Nov. 9, 2016)(Parker, J.), Borrego states that consent decrees -- and by implicit extension, consent judgments -- are enforceable judicial decrees just like any garden variety court order.  See Motion at 4.  He then states that, because consent judgments are "the products of stipulation between parties," they also are "contractual in nature and are to be enforced in accord with the intent of the parties."  Motion at 4 (citing 11A Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure § 4443 (3d ed. 2023)).

Borrego then argues that, under the legal standard for contempt, the Court should order BLM to show cause why as it has not violated the Consent Judgment's terms.  See Motion at 5.  Borrego states that legal standard for contempt as: "A court may hold a party in contempt upon a showing, by clear and convincing evidence, 'that a valid court order existed, that the [non-movant] had knowledge of the order, and that the [non-movant] disobeyed the order.'"  Motion at 5 (quoting McClendon v. City of Albuquerque, 2016 WL 9818311, at *5).  Borrego asserts that the BLM is "well informed of the terms and conditions of the 2015 Consent Judgment given

---

[2]The Court notes that Borrego's quoting of the August 18 Letter leaves an inaccurate impression.  The quoted material comes from a sentence in which Ms. Napolitano -- the Letter's author -- is describing the contents of the June 1 Letter, and states: "The letter also discussed additional requirements for Mr. Borrego to complete the direct sale and informed Mr. Borrego of certain reservations, restrictions, and conditions that will be included in the patent if the direct sale is completed."  August 18 Letter at 2.

that it filed a Motion to Enforce the Settlement Agreement on April 17, 2015 . . . compelling Mr.

Borrego to execute the 2015 Agreement."  Motion at 5.

Borrego then makes two discrete arguments why the BLM disobeys the Consent

Judgment and thus should be subject to civil contempt.  See Motion at 5-6.  First, Borrego asserts

that the BLM did not timely initiate the sale of the 1.4-Acre Parcel under the Consent

Judgment's terms.  See Motion at 5.  Borrego contends that the Consent Judgment obligates the

BLM to "to initiate the conveyance of the 1.4-acre to Mr. Borrego 'within 30 days' of Mr.

Borrego paying the $15,000 cost share and conveying the 40-acre Taos Property to the United

States."  Motion at 5 (quoting Consent Judgment ¶ 1(b), at 9).  Borrego then asserts that BLM

has failed to fulfill this obligation, because it has did not initiate any transaction with Borrego

until the June 1 Letter, which Borrego states "comes over *six* years too late."  Motion at 6

(emphasis in original).

Borrego's second argument why the BLM is disobeying the Consent Judgment is that the

BLM has failed to convey the 1.4-Acre Parcel to Borrego upon his fulfillment of his obligations

under Consent Judgment.  Borrego argues that he

> has fulfilled all of his obligations under the 2015 Settlement Agreement, by
> paying his share of the costs and by conveying the 40-acre Taos property to the
> United States. The BLM has violated the 2015 Consent Judgment by wrongfully
> making additional demands not agreed upon before transferring the 1.4-acre and
> as demonstrated in the BLM's June 1, 2023 letter which demands Mr. Borrego
> pay additional money, complete a Color-of-Title Application and agree to an
> additional right-of-way. Not only were these additional conditions previously
> rejected by Mr. Borrego, they are not stated in the 2015 Consent Judgment. As the
> BLM disobeys the Court's orders and continues to act in direct disregard of the
> 2015 Consent Judgment, an Order to Show Cause is justified and necessary.

Motion at 6.

Next, Borrego argues that the Court should enforce the Consent Judgment's terms and

conditions, because the Consent Judgment gives the Court the authority to "to resolve any

disputes that may arise during the performance" of the agreement.  Motion at 7 (quoting Consent

Judgment at 4).   He also asserts that the Consent Judgment's terms should be construed

according to New Mexico contract law.  See Motion at 7 (citing United States v. McCall, 235

F.3d 1211, 1215 (10th Cir. 2000)).   Then -- in apparent anticipation of the possibility of

amending the Consent Judgment -- Borrego forwards an argument that such an action would go

against the parties' intent in forming the original agreement.  See Motion at 7.  He argues that the

agreement is the result of significant negotiations and thus the lack of "any clear language in the

2015 Agreement that Mr. Borrego would be required to make additional payments for the 1.4-

acre" parcel is significant.  Motion at 7.

Borrego asserts that the Settlement Agreement's language is clear and "unambiguous,"

and forwards his interpretation of the Agreement's terms:

> The parties' intention that the direct sale procedures would be more
> workable and save costs is reflected in the unambiguous language of Paragraph
> 1(b) which states that the conveyance of the 1.4-acre "will be pursuant to the
> process outlined in 43 C.F.R. Subpart 2710, **subject to the terms and conditions
> of**" the 2015 Agreement.  ECF 95 at 9 (emphasis added).  And, Paragraph 1(b)
> refers to Paragraph 1(d), which controls all monetary payments required of Mr.
> Borrego and states:
>
>> Any and all transactions costs incurred by the United States in the
>> direct sale process and the acceptance of the [40-acre Taos
>> Property] will be shared between the parties. Borrego agrees to
>> assume and pay 40% of the costs. However, such costs assumed
>> and paid by Borrego will in no event exceed $15,000.
>
> ECF 95 at 10.  Now, years after the BLM compelled Mr. Borrego to execute the
> 2015 Agreement, the BLM, for the first time, alleges that Mr. Borrego must pay
> an additional $14,000 for the 1.4-acre relying on the standalone citation to the
> Federal Code in violation of the 2015 Agreement.

Motion at 8 (citing Consent Judgment at 9, 10)(brackets in original; emphasis in Motion, but not

in Consent Judgment).  Borrego argues that the "United States has clearly already received more

than fair market value by receiving the 40-acre Taos Property, which is about thirty times the

size of the 1.4-acre."   Motion at 9.   To further support his interpretation of the Agreement,

Borrego states that he "specifically objected to language that the BLM had drafted in an initial

version of the settlement agreement that Mr. Borrego was donating or 'voluntarily' conveying

the 40-acre Taos Property."   Motion at 9 (quoting Motion to Enforce Settlement Agreement at

32, filed April 17, 2015 (Doc. 89)).   In response to this objection, he states, Magistrate Judge

Wormuth removed the word "voluntarily" from the agreement.   Motion at 9 (quoting Clerk's

Minutes for Hearing Held May 1, 2015, Before Magistrate Judge Wormuth at 5, filed May 1,

2015 (Doc. 93)).   He argues that this omission indicates that the Court "rejected any contention

that Mr. Borrego's grant of the 40-acre Taos Property would be for free or not in exchange for

the 1.4-acre."   Motion at 9.

> Borrego concludes this portion of his Motion by stating:
>
> > The 2015 Agreement establishes that Mr. Borrego will grant the 40-acre
> > Taos Property to the United States and will share the costs of the sale of the 1.4-
> > acre but that all and any costs will be limited to $15,000.   The 2015 Agreement
> > does not provide for any other or additional payments by Mr. Borrego.   If the
> > parties intended Mr. Borrego to pay more money in addition to conveying the 40-
> > acre Taos Property to the BLM, the parties would not have referred to the deal as
> > an "exchange" of parcels as the parties did during the May 1, 2015 hearing, see
> > Audio Recording: May 1, 2015 Hearing at 23:00 (on file with Court), would have
> > advised the Court of those critical terms, and would have explicitly stated such
> > terms under these contentious circumstances.

Motion at 9.   Borrego then argues that, if the Agreement is construed in the manner that the BLM

argues -- the Agreement is "unconscionable as it would so disfavor Mr. Borrego and unfairly

advantage the BLM, the drafter of the 2015 Agreement."   Motion at 10.   He also argues that case

law from the Tenth Circuit prohibits an amendment to the Agreement under the case's

circumstances.   See Motion at 10-12 (citing and discussing United States v. McCall, 235 F.3d

1211 (10th Cir. 2000)).

Borrego then argues that the "additional conditionals and reservations" in the June 1 Letter are not part of the original Agreement.  See Motion at 12.  To support this argument, Borrego points to the Agreement's language, see Motion at 12 (citing Consent Judgment  at 10), and also to some discussion that occurred at a hearing in front of Magistrate Judge Wormuth, see Motion at 13 (citing Audio Recording of Hearing Held May 1, 2015, Before Magistrate Judge Wormuth at 37:00-38:00 (on file with Court)).  He also objects to what he characterizes as the BLM's attempt to "broaden access" to the 1.4-Acre Parcel in a manner that is contrary to the original Agreement.  Motion at 13-14.

In the Motion's last section, Borrego asserts that a district court has "inherent powers" to assess fees for a failure to comply with the court's orders so long as the offending party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons."  Motion at 15 (quoting United States v. McCall, 235 F.3d at 1216).  Here, he asserts that the BLM's actions "departs significantly from any reasonableness," because -- contrary to Borrego's interpretation of the agreement --

> while the parties executed the 2015 Agreement and agreed to a specific sum for any and all transactions costs incurred in the performance of the terms, the BLM failed to initiate the transfer within the 30-day period specified in the 2015 Agreement and now wrongfully asserts that Mr. Borrego must pay more money based on a new appraisal.

Motion at 16.  Moreover, in addition to sanctions under the Court's "inherent power," Motion at 16, Borrego states that civil contempt sanctions are also appropriate in this case in light of BLM's "failure to transfer the 1.4-acre [sic] to Mr. Borrego, which has forced Mr. Borrego to incur additional attorney fees and costs."  Motion at 15 (citing McClendon v. City of Albuquerque, 2016 WL 9818311, at *2; Woodruff v. Herrera, No. CIV 09-0449 JH/KBM, 2015 WL 13559899, at *2 (D.N.M. Nov. 16, 2015)(Herrera, J.); Allred v. New Mexico Dep't of Transportation, 2017-NMCA-019, ¶ 41, 388 P.3d 998, 1010).   Borrego concludes by requesting

the Court to issue "an Order to Show Cause on why the BLM has failed to comply with the terms of the 2015 Consent Judgment and moves the Court to Enforce the 2015 Consent Judgment and order the BLM to convey to Mr. Borrego the 1.4-acre without further delay or expense."  Motion at 17.

### 3.      **The October 12, 2023, Hearing**.

On October 12, 2023, the Court held a hearing concerning the United States' Motion for Extension of Time to Respond to Motion for Order to Show Cause and to Enforce Settlement Agreement, filed October 11, 2023 (Doc. 100).  The United States opened the hearing by stating that the matter had "rearose just recently" after many years in which it had been dormant, and that "Interior/BLM needs some additional time to assemble materials to enable [it] to craft an appropriate response" to the Motion.  Draft Transcript of October 12, 2023 Hearing at 3:12 (held October 12, 2023)(Ortega)("Oct. 12 Tr.");[3] id. at 4:5-7.  The Court then noted its impression that the Motion "looked like a strong one," Oct. 12 Tr. at 4:18 (Court), and then made the following suggestion:

> [W]hat if we went ahead and just granted the order to show cause, and go ahead and then set a show cause hearing at a date.  And maybe Mr. Borrego, since he would be getting a hearing on this -- on the show cause, he might be a little more generous as far as an extension of time.  What would you think about that?  So we go right to the meat of the issue rather than spending more time on response to the motion to show cause.

Oct. 12 Tr. at 5:7-16 (Court).  The United States agreed that the Court's suggestion "would make a lot of sense," Oct. 12 Tr. at 5:18 (Ortega), and Borrego agreed that the Court's "suggestion makes sense," Oct. 12 Tr. at 7:7 (Marks).  As a result of the parties' acceptance of this suggestion, the Court filed an Order Granting Motion for Extension of Time and Motion for an

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Order to Show Cause, filed October 24, 2023 (Doc. 103).  Accordingly, the Court scheduled a

Show Cause hearing for November 28, 2023.  See Notice of Show Cause Hearing, filed October

12, 2023 (Doc. 102)(text only).

        **4.**        **The Response.**

The United States filed its response on November 13, 2023.  See Response at 1.  The

United States introduces its response by offering its version of the nature of the Consent

Judgment and of the Settlement Agreement.  See Response at 2-5.  The United States begins by

outlining the pre-settlement history of the case, and then states that,

> In the course of litigation, the parties entered into a settlement agreement that was
> designed to both compensate the United States for the unauthorized use of public
> lands and to establish a process for Mr. Borrego to have the opportunity to
> purchase a 1.4-acre portion of Tract 24, known as "Tract 24B,", [sic] at fair market
> value.

Response at 2 (source of quoted material not cited).  The United States describes this transaction

as the result of "arms-length negotiations."  Response at 2.  The United States' interpretation of

the Settlement Agreement is reflected in the following:

> The Settlement Agreement addresses both the damages caused by Mr.
> Borrego's trespass and establishes a process for Mr. Borrego to acquire a portion
> of the trespass lands from the United States. See Doc. 95. First, in paragraph 1(a)
> of the Settlement Agreement, Mr. Borrego was required to provide a Warranty
> Deed for 40 acres of land in Taos County to the United States in compensation for
> the trespass damages. Second, paragraph 1(b) provided for the United States to
> propose a direct sale to Mr. Borrego for 1.4 acres of public land ("Tract 24B"),
> which is located within a portion of a larger parcel, known as Tract 24, near
> Lyden, New Mexico. Paragraph 1(b) further explained that BLM would propose a
> direct sale to Mr. Borrego, following the BLM's regulatory process outlined at 43
> C.F.R. § 2710. The Settlement Agreement included one deviation from BLM's
> standard administrative process for land sales, in that Mr. Borrego and the United
> States would share transactional costs associated with the sale and that Mr.
> Borrego's transactional costs would be limited to $15,000. These transactional
> costs included the preparation of an appraisal that would provide the fair market
> value cost of the 1.4 acres that Mr. Borrego would be responsible to pay for the
> purchase.

Response at 2-3.  The United States also provides its interpretation of the more recent developments in the case -- discussing the correspondence between the parties that has occurred since the summer of 2023.  See Response at 3-4.

The United States also asserts that it has "complied with the consent judgment and settlement agreement," and therefore "should not be held in contempt."  Response at 5.  The United States asserts -- almost in passing and with no citation to either the record or to any legal authority -- that the "Settlement Agreement is incorporated into the Consent Judgment which was entered against Borrego in favor of the United States."  Response at 5.  After making this concession, the United States spends much of the remainder of its Response arguing that it cannot be held in contempt for violation of the Consent Judgment and Settlement Agreement, because its interpretation of the Consent Judgment and Settlement Agreement is reasonable.  See Response 5-13. The United States bases this argument on the notion that "[a] party may avoid a finding of contempt if it demonstrates that it attempted compliance in good faith based on a reasonable interpretation of the order."   Response at 6 (citing McClendon v. City of Albuquerque, No. CIV 95-0024 JAP/KBM, 2016 WL 9818311, at *5; Braintree Lab'ys, Inc. v. Nephro-Tech, Inc., 99 F. Supp. 2d 1300, 1303 (D. Kan. 2000)(Lungstrum, J.)).  Based on this concept, the United States undertakes a plain language interpretation of the Settlement Agreement's provisions, and concludes that its interpretation is reasonable and that it complied in good faith with that interpretation.  See Response at 6-8.  The United States also supports its interpretation of the Settlement Agreement with discussion of various discussions between the parties that took place in the months leading up to the Consent Judgment.  See Motion at 8-9.  The United States further contends that the reason why there is nothing about a price in the Settlement Agreement is that, "[a]t the time of the Settlement Agreement, the parties were

unaware of the fair market value of the proposed sale property," which was to be determined later at the time of the direct sale.  Response at 10-11.  The United States also specifies its understanding of what constitutes "transactional costs" for the Settlement Agreement's purposes, which the United States asserts "refer to the administrative costs that the United States will incur in both the direct sale process and acceptance of the Taos County Property, including but not limited to, appraisal costs, cadastral survey[4] costs, closing costs, recording costs, newspaper and federal register publication costs, and environmental assessment costs."  Response at 11 (citing Declaration of Mark T. Lujan ¶¶ 11-15, at 3-4 (dated November 13, 2023), filed November 13, 2023 (Doc. 106-3); id. ¶¶17-21, at 4-5; Letter from Howard Thomas to Ernest Padilla (dated December 8, 2014), filed November 13, 2023 (Doc. 106-9)).

The United States also contends that it timely initiated the direct sale in accordance with the Settlement Agreement's relevant provisions.  See Response at 13-16.  The United States asserts that it was "in regular contact with Mr. Borrego regarding the various administrative steps" that needed to be fulfilled before the sale could be completed, Response at 13, and that BLM received its "$15,000 cost-share on July 8, 2015,"  Response at 14.  The Response also outlines some challenges in reaching Mr. Borrego in 2017 regarding "administrative actions that need to occur as part of the direct sale process, such as a cadastral survey, resource evaluations, mineral report, environmental analysis, and appraisal to determine the market value of Tract 24B."  Response at 14 (citing Letter from Sarah Schlanger to Gilbert Borrego (dated June 1, 2017), filed November 12, 2023 (Doc. 106-4)).  The United States, in short, argues that it

---

[4]"Cadastral surveying is the sub-field of cadastre and surveying that specializes in the establishment and re-establishment of real property boundaries.  It involves the physical delineation of property boundaries and determination of dimensions, areas and certain rights associated with properties.  This is regardless of whether they are on land, water or defined by natural or artificial features."  Cadastral Surveying, Wikipedia, https://en.wikipedia.org/wiki/Cadastral_surveying (last visited December 12, 2023).

regularly and timely communicated with Borrego about various requirements that needed to be fulfilled before the direct sale could be completed, and "took all required administrative steps between 2016 and 2023 and is prepared to finalize the sale once Borrego pays fair market value." Response at 16.

The Response's concluding section distinguishes this case's circumstances from the facts in United States v. McCall, 235 F.3d 1211, on the basis that -- unlike in that case -- here "[t]he BLM did not abruptly change its position or modify any material term of the Settlement Agreement."  Response at 20.  The United States also asserts that the Court should not award attorney's fees and costs to Borrego, distinguishing Woodruff v. Herrera, 2015 WL 13559899, on the basis the BLM in this case has complied with the Settlement Agreement's terms and timely has taken all actions required by it to further the process of finalizing the sale.  See Response at 21-22.  The United States contends that "[t]he solution here is simple: Once the BLM receives the fair market value for Tract 24B from Mr. Borrego, it will transfer this parcel to him."  Response at 22.  In the meantime, the United States asserts, the Court

> should neither hold the United States in contempt, nor issue sanctions against the United States. Sanctions are not warranted against the United States since it has complied in good faith with the Settlement Agreement based on a reasonable interpretation of the same. The United States respectfully requests this Court to enforce the Consent Judgment and Settlement Agreement and order Mr. Borrego to remit fair market value for Tract 24B and reserve a right-of-way for ditches and canals, without further delay or expense.

Response at 23.

   **5.**   **The Reply**.

In the Reply, Borrego largely restates his arguments from the Motion and also replies to the arguments that the United States raises in the Response.  First, Borrego emphasizes that "[t]he BLM does not dispute . . . that the settlement agreement incorporated into the Consent

Judgment . . . is valid and binding."  Reply at 1 (citing Response at 5-6).  Borrego then asserts that the United States' interpretation of the Settlement Agreement is an attempt to "alter the principle terms of the agreement, by claiming there was no land exchange and forcing Mr. Borrego to pay additional money after already receiving the benefit of the 40 acres."  Reply at 1. Against the United States' assertions of "good faith" compliance with the Settlement Agreement as a defense for contempt, Borrego quotes <u>Trujillo v. Williams</u>, No. CIV 04-0635-MV-GBW, 2019 WL 1746305, at *3 (D.N.M. Apr. 18, 2019)( Vázquez, J.), for the proposition that, "[i]n determining whether civil contempt sanctions are warranted, neither the validity of the underlying order nor the noncomplying party's 'good faith' enters into the equation; rather, 'the question is whether the alleged contemnor complied with the court's order.'"  Reply at 2. Beyond this disagreement regarding the proper legal framework for contempt, Borrego continues to argue that the parties had agreed to a "land exchange," Reply at 2, and that the plain language of the Settlement Agreement's provisions support his contentions, <u>see</u> Reply at 3-9.  Borrego asserts the BLM has failed to make any reasonable efforts to comply with the Consent Judgment and the Settlement Agreement, <u>see</u> Reply at 9-10, and also accuses the United States of retroactively demanding a right-of-way that is contrary to the original agreement, Reply at 10-11. Borrego concludes by stating that the United States' representations in the Response confirm that "it not only has disobeyed the 2015 Consent Judgment, but it did so knowingly and has no intention to comply. Thus Mr. Borrego respectfully requests the Court enter a finding of contempt against the BLM and award sanctions and all necessary relief."  Reply at 12.

     **6.**     <u>**The November 28, 2023, Hearing**</u>.

     The Court held a Show Cause hearing on November 28, 2023.  <u>See</u> Clerk's Minutes (dated November 28, 2023), filed November 28, 2023 (Doc. 109).  At the hearing, Borrego

- 18 -

began by arguing -- as he did in the Motion and Reply -- that "BLM has failed to comply with the settlement agreement" and should be held in contempt.  Draft Transcript of November 28, 2023, Hearing at 2:17-18 (held November 18, 2023)(Marks)("Nov. 12 Tr.").[5]  With respect to his request for contempt, the Court questioned Borrego about the notion that the United States' action violated a court order:

> What about the document itself?  Because it seems to me -- you know, I have lots of consent decrees in front of me, and I usually just am looking at the language of the consent decree.  What is it in the consent decree that you think makes this a land exchange?

Nov. 12 Tr. at 5:7-12 (Court).  When Borrego pointed to the language of provisions 1(a) and 1(b) of the Settlement Agreement, <u>see</u> Nov. 12 Tr. at 5:13-6:2 (Marks), the Court responded:

> But that's what concerns me a little bit.  You keep putting in the work "fundamentally," and going to the transcript, and things like that.  It's not really in the document I have to enforce.  That's my concern, is that what you're asking for is more than what's in the document itself.
>
> . . .
>
> I'll enforce the document, the consent decree.  I mean, that's the document that I have.  But if it's not in there, I probably am not going to go any further, either for the Government or for you.

Nov. 12 Tr. at 6:3-16 (Court).  Borrego and the United States subsequently presented their arguments regarding their respective interpretations of the Settlement Agreement, but the Court again returned to its concerns regarding the enforceability of the Settlement Agreement:

> Where in the consent decree, or in the consent judgment, does it say that the settlement agreement is incorporated into it?  I mean, I have -- all the time I have people settle cases, and they have settlement agreements.  But that doesn't mean it's enforceable by me.  In fact, to have a court have jurisdiction to enforce a settlement agreement, you know, I have to expressly say it in the judgment.  And this consent decree says I retain jurisdiction over this case during the period in

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

which this consent judgment will be performed . . . So I'm not question there yet that I have the ability to enforce the settlement agreement.

. . .

Y'all may have a settlement agreement that needs to be enforced, but I'm not sure this consent judgment does it for anybody.  The first sentence is sort of the same way.  That the parties agree and consent to a judgment all pursuant to a settlement agreement.  But it doesn't incorporate into the consent judgment the settlement agreement . . . I have power to enforce the consent judgment, but not the other.

Nov. 12 Tr. at 20:3-21:16 (Court).  The Court ultimately took the matter under advisement, and told the parties that it would "try to have something out two weeks from today, by the end of business."  Nov. 12 Tr. at 43:22-23 (Court).

## RELEVANT LAW REGARDING CIVIL CONTEMPT

Contempt of court is "the disregard of judicial authority," which a court may punish as "an inherent and integral element of its power."  11A Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure § 2960 (3d ed. 2023).  See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)("[I]t is firmly established that '[t]he power to punish for contempt is inherent in all courts.'" (quoting Ex parte Robinson, 86 U.S. 505, 510 (1873))).   Contempt applies to "disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial."  Chambers v. NASCO, Inc., 501 U.S. at 44.  In the Tenth Circuit, "[t]o prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."  Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1315 (10th Cir. 1998)(citing Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995)).  See Pueblo of Pojoaque v. New Mexico, No. CIV 15-0625, 2016 WL 3135644, at *11 (D.N.M. April 21, 2016)(Browning, J.); McClendon v. E.M., No. CIV 95-0024, 2023 WL 6622095, at *14-15 (D.N.M. Oct. 11, 2023)(Browning, J.).

**LAW REGARDING FEDERAL COURT JURISDICTION TO ENFORCE
SETTLEMENT AGREEMENTS**

"Once a lawsuit is settled and dismissed, the district court does not generally have 'ancillary jurisdiction to enforce the parties' settlement agreement. A district court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.'" McKay v. United States, 207 F. App'x 892, 894 (10th Cir. 2006)(unpublished)(quoting Morris v. City of Hobart, 39 F.3d 1105, 1110 (10th Cir. 1994)(citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380-81 (1994)("Kokkonen")). Accordingly, a federal court does not, ipso facto, have jurisdiction over a settlement agreement by virtue of the settlement agreement resolving claims which the federal court previously entertained. See In re Burlington N. Santa Fe Rail Corp., No. CIV 04-0836 JB/RLP, 2007 WL 5685129, at *12 n.5 (D.N.M. Oct. 11, 2007)(Browning, J.)("The Court has, however, no ancillary jurisdiction over the settlement agreement of the parties, because the Court did not explicitly retain such jurisdiction in its order dismissing this case with prejudice pursuant to joint motion."). As a result, often the key inquiry in determining whether a district court has retained jurisdiction over a settlement agreement is whether the order "shows an intent to retain jurisdiction or incorporates the settlement agreement." McKay v. United States, 207 F. App'x at 894 (quoting Morris v. City of Hobart, 39 F.3d at 1110 (citing Kokkonen, 511 U.S. at 380-81)).

This inquiry begins with the analysis that the Supreme Court of the United States described in Kokkonen. In Kokkonen, the Supreme Court considered the question whether a district court had "inherent power" to enforce the terms of a settlement agreement under the doctrine of ancillary jurisdiction. 511 U.S. at 377. The facts of Kokkonen involve a stipulation and order of dismissal that was entered after "the parties arrived at an oral agreement settling all claims and counterclaims, the substance of which they recited, on the record, before the District

Judge in chambers." 511 U.S. at 376.  Importantly, however, the order of dismissal entered by the district court "did not reserve jurisdiction in the District Court to enforce the settlement agreement" and "did not so much as refer to the settlement agreement." 511 U.S. at 377.  In a subsequent action brought by the defendant to enforce certain obligations of the settlement agreement, the district court entered an "enforcement order" under what it termed its "inherent power." 511 U.S. at 377.  The United States Court of Appeals for the Ninth Circuit affirmed, reasoning that a "district court ha[s] jurisdiction to decide the [enforcement] motion[ ] under its inherent supervisory power." Kokkonen, 511 U.S. at 377 (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 993 F.2d 883 at *1 (9th Cir. 1993)(unpublished)).

The Supreme Court reversed, concluding that the district court was without jurisdiction to enforce the settlement agreement.  See 511 U.S. at 380-81.  To reach this conclusion, the Supreme Court first examined the doctrine of ancillary jurisdiction as a possible basis for the district court's authority to enforce the settlement agreement.  See 511 U.S. at 379-80.   It explained that ancillary jurisdiction -- which the Supreme Court acknowledged is a concept that "can hardly be criticized for being overly rigid or precise," 511 U.S. at 379 -- is used for two broad purposes: "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent," 511 U.S. at 379 (citing Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469, n. 1 (1974); Moore v. N.Y. Cotton Exchange, 270 U.S. 593, 610 (1926)); and "(2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees," Kokkonen, 511 U.S. at 380 (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991)); United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812)).  The Supreme Court concluded that neither of these purposes were apposite to the case before it:

> As to the first, the facts underlying respondent's dismissed claim for breach of agency agreement and those underlying its claim for breach of settlement

agreement have nothing to do with each other; it would neither be necessary nor even particularly efficient that they be adjudicated together.

. . . .

[T]he power asked for here is quite remote from what courts require in order to perform their functions.   We have recognized inherent authority to appoint counsel to investigate and prosecute violation of a court's order.   *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 . . . (1987).   But the only order here was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement.

Kokkonen, 511 U.S. at 380-81.   Absent these sources of ancillary jurisdiction, the Supreme Court then concluded that the district court lacked jurisdiction to enforce the settlement agreement: "The suit involves a claim for breach of a contract, part of the consideration for which was dismissal of an earlier federal suit.   No federal statute makes that connection (if it constitutionally could) the basis for federal-court jurisdiction over the contract dispute."   511 U.S. at 381.   It also stated that, generally, "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction."   511 U.S. at 382.   The Supreme Court stated, however;

The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal -- either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist. That, however, was not the case here. The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order.

511 U.S. at 381.

In the years after Kokkonen, lower courts have grappled with the question of how settlement terms might be incorporated into a court order.   See Jeffrey A. Parness & Matthew R. Walker, Enforcing Settlements in Federal Civil Actions, 36 Ind. L. Rev. 33, 38-54 (2003).

- 23 -

Clearly, only if the terms of the settlement agreement are part of the court's order does the court retain the authority to enforce the terms of the settlement agreement: "[W]hen the district court retain[s] jurisdiction, it necessarily ma[k]e[s] compliance with the terms of the agreement a part of its order so that 'a breach of the agreement [is] a violation of the order.'"  Roberson v. Giuliani, 346 F.3d 75, 82 (2d Cir. 2003)(quoting Kokkonen, 511 U.S. at 381).  Although the Tenth Circuit has yet to consider directly what is required for an order to incorporate a settlement agreement's terms, it has stated:

> The order did refer to the settlement agreement and did state that dismissal was appropriate because the terms and conditions of the agreement had been fully performed. But it did not order the parties to comply with the terms of the agreement and it did not condition dismissal upon future compliance. A court always retains jurisdiction to vindicate its orders, but here the "the only order . . . was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement." *Kokkonen,* 511 U.S. at 380-81 . . . .

McKay v. United States, 207 F. App'x at 895.

This analysis accords with more explicit statements made by other Courts of Appeals, which have concluded that a mere reference to a settlement agreement is insufficient to incorporate that agreement's terms in a subsequent court order: "A dismissal order's mere reference to the fact of settlement does not incorporate the settlement agreement in the dismissal order."  Miener By & Through Miener v. Mo. Dep't of Mental Health, 62 F.3d 1126, 1128 (8th Cir. 1995)(citing Hagestad v. Tragesser, 49 F.3d 1430, 1432 (9th Cir. 1995); Lucille v. City of Chicago, 31 F.3d 546, 548 (7th Cir. 1994)(concluding that a judgment stating it was "entered in accordance with" settlement agreement did not incorporate settlement)).   Similarly, the United States Court of Appeals for the Third Circuit has held that the phrase "pursuant to the terms of the Settlement" in a court's order does not incorporate the terms of the referenced settlement agreement.  In re Phar-Mor, Inc. Sec. Litig., 172 F.3d 270, 274 (3d Cir. 1999)(quoting In re Phar-

Mor, Inc. Sec. Litig., Civ. Action No. 92-1938 (W.D. Pa. Aug. 4, 1995)(Ziegler, J.)).  Further, shortly after Kokkonen, the United States Court of Appeals for the District of Columbia suggested that, typically, the full text of a settlement agreement should be included into a stipulation or order to ensure incorporation.  See Bd. of Trustees of Hotel & Rest. Emps. Loc. 25 v. Madison Hotel, Inc., 97 F.3d 1479, 1484 n.8 (D.C. Cir. 1996).  In addition, the United States Court of Appels for the Fifth Circuit has stated that simply because a settlement agreement is attached to a district court's order, this fact is "not . . . sufficient to incorporate the Agreement into the order under *Kokkonen*. At most, physical attachment of a settlement agreement to a dismissal order evinces the district judge's 'awareness and approval of the terms of the settlement agreement,' which 'do not suffice to make them part of his order.'"  Hosp. House, Inc. v. Gilbert, 298 F.3d 424, 431 (5th Cir. 2002)(quoting Kokkonen, 511 U.S. at 381).  The trend in the post-Kokkonen cases is to construe "incorporation" relatively strictly and to require something more than a mere reference to a settlement agreement in the district court's order.  See StreetEasy, Inc. v. Chertok, 752 F.3d 298, 304-06 (2d Cir. 2014)(Lynch, J.)(discussing cases). Cf. Williams v. United States, 947 F.2d 37, 40 (2d Cir. 1991)("[S]ubject matter jurisdiction may not be created by estoppel or consent of the parties.").  See also Macias v. New Mexico Dep't of Lab., 300 F.R.D. 529, 554-65 (D.N.M. 2014)(Browning, J.).

## ANALYSIS

The Court denies the Motion, and thus declines to hold the United States in contempt or to sanction the United States for violations of the Court's Consent Judgment.  While the Court has continuing jurisdiction to enforce the Consent Judgment, the Court concludes that the Settlement Agreement's terms are not incorporated therein, nor is there a separate provision in the Consent Judgment which provides jurisdiction over the Settlement Agreement.  The Court notes, in addition, that even if it had subject-matter jurisdiction over a dispute concerning the

Settlement Agreement, the Court may not use its contempt power to enforce the Settlement Agreement.  This conclusion is because, without some incorporation of the Settlement Agreement into the Consent Judgment, the former is not part of any "order" that the Court can enforce with its contempt power.

I.   **THE COURT CANNOT ENFORCE THE TERMS OF THE SETTLEMENT AGREEMENT BY WAY OF CIVIL CONTEMPT, BECAUSE THE SETTLEMENT AGREEMENT -- UNLIKE THE CONSENT JUDGMENT -- IS NOT A COURT ORDER.**

The Court acknowledges that it retains jurisdiction over the Consent Judgment that the Court entered in this case, so it may "resolve any disputes that arise during the performance" of the Consent Judgment.  Consent Judgment at 4.  As discussed above, however, the crux of the present dispute between the parties concerns a provision that is not in the Consent Judgment, but in the Settlement Agreement.  Specifically, the parties' main dispute relates to a contractual interpretation of provisions 1(a) and 1(b) of the Settlement Agreement, which concern the consideration that eventually led to the parties' Consent Judgment.  See Consent Judgment ¶¶ 1(a)-(b), at 8-9.  That disagreement, however, is a contractual dispute between the parties, because the Settlement Agreement is not incorporated into the Consent Judgment.  Accordingly, the Settlement Agreement is not a court order, and the Court cannot enforce the Settlement Agreement through contempt.

A.   **THE CONSENT JUDGMENT DOES NOT INCORPORATE THE SETTLEMENT AGREEMENT'S TERMS.**

As discussed above, in Kokkonen, the Supreme Court considered the circumstances under which a federal court retains jurisdiction to enforce settlement agreements, and also -- more broadly -- considered the relationship between settlement agreements and the orders of judgment or dismissal that follow such agreements.  511 U.S. at 377.  Under Kokkonen, a district

court may retain jurisdiction to enforce a settlement agreement provided that an order of that court "incorporat[es] the terms of the settlement agreement in the order," or a "separate provision" in the order retains jurisdiction over the settlement agreement. 511 U.S. at 381. Absent such incorporation or a provision retaining jurisdiction, the settlement agreement is not part of the order. See 511 U.S. at 381. Since Kokkonen, the lower courts have concluded that incorporation of a settlement agreement requires more than just a reference to the settlement agreement. See In re Phar-Mor, Inc. Sec. Litig., 172 F.3d at 274; Miener By & Through Miener v. Missouri Dep't of Mental Health, 62 F.3d at 1128; Lucille v. City of Chicago, 31 F.3d at 548.

Here, the Consent Judgment only mentions the Settlement Agreement to state that the Consent Judgment was entered "pursuant to a Settlement Agreement executed by the parties," Consent Judgment at 1, or "entered pursuant to the terms of the attached Settlement Agreement executed by the parties," Consent Judgment at 4. This reference is insufficient to incorporate the terms of the Settlement Agreement into the Court's Consent Judgment. Although the Tenth Circuit is yet to offer specific guidance on the language that is required to incorporate a settlement agreement into a court order under the Kokkonen principles, the great weight of the authority from other Courts of Appeals indicate that such a reference is not sufficient to incorporate the terms of a settlement agreement. See, e.g., In re Phar-Mor, Inc. Sec. Litig., 172 F.3d at 274; Miener By & Through Miener v. Mo. Dep't of Mental Health, 62 F.3d at 1128; Lucille v. City of Chicago, 31 F.3d at 548. Moreover, beyond these two references to the Settlement Agreement, the Consent Judgment offers no additional allusions of any kind to the Settlement Agreement. The crux of the parties' dispute in the Motion -- over the meaning of the Settlement Agreement's provisions 1(a) and 1(b) -- is a matter that is absent from the Consent Judgment's provisions. In short, because the Consent Judgment does not incorporate explicitly

the Settlement Agreement's terms, the Settlement Agreement's provisions are not part of any Court order; rather, they are merely the terms of a contract between the United States and Borrego.  Cf. Kokkonen, 511 U.S. at 381 ("The suit involves a claim for breach of a contract, part of the consideration for which was dismissal of an earlier federal suit.").

**B.  BECAUSE THE SETTLEMENT AGREEMENT'S PROVISIONS 1(a) AND 1(b) ARE NOT PART OF ANY COURT ORDER, THE COURT MAY NOT ENFORCE THESE PROVISIONS THROUGH ITS CONTEMPT POWER.**

In Kokkonen, the Supreme Court's conclusion about the non-incorporation of the settlement agreement into the district court's dismissal order ultimately meant that the district court lacked subject-matter jurisdiction to enforce the settlement agreement.  See Kokkonen, 511 U.S. at 382 ("[E]nforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction.").  Here, regardless whether the Court has subject-matter jurisdiction to entertain a contract action arising from the Settlement Agreement, the Court may not enforce any provision of the Settlement Agreement via its contempt power because those provisions are not part of any court order.  See Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d at 1315 ("To prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed . . . .").  To further illustrate this point, the Court concludes that the Tenth Circuit's opinion in Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367 (10th Cir. 1996)(Briscoe, J.)("Consumers Gas & Oil"), is instructive.

In Consumers Gas & Oil, the defendant-appellant Farmland Industries, Inc. appealed a contempt order issued by the district court "upon its finding that Farmland breached an order approving the parties' settlement agreement."  Consumers Gas & Oil, 84 F.3d at 368.  On review, the Tenth Circuit reversed the district court's issuance of the contempt order, because the

order -- which the district court found Farmland Industries had violated -- "did not contain the provision allegedly violated by Farmland." Consumers Gas & Oil, 84 F.3d at 368. Consumers Gas & Oil's basic facts are as follows: Farmland Industries is a Kansas-based regional agricultural cooperative, and plaintiff-appellee Consumers Gas & Oil, Inc. was a former Colorado-based farm cooperative. 84 F.3d at 368. At the time of the events giving rise to the lawsuit, Consumers Gas & Oil, Inc. was a member of Farmland Industries. See 84 F.3d at 368. The lawsuit began when Consumers Gas & Oil, Inc. brought claims against Farmland Industries "under various federal and state theories to recover equity that Farmland allegedly wrongfully refused to redeem." 84 F.3d at 368. The parties entered, however, into a "Stipulation of Settlement," and the district court approved that "Stipulation of Settlement." 84 F.3d at 369. The district court entered an order, which "discussed in detail the manner in which Farmland was to satisfy Consumers' claims," and also stated: "This Order shall be considered an implementation of the Stipulation of Settlement. The Stipulation of Settlement shall not be considered merged into this Order or superseded by it." 84 F.3d at 369. The order also, however, provided:

> Without affecting the finality of this Judgment in any way, the Court reserves continuing jurisdiction over the implementation and enforcement of the terms of the Stipulation of Settlement and any issues relating to Subclass membership, notice to Class Members, distributions to Class Members, allocation of expenses among the class, disposition of unclaimed payment amounts, and all other aspects of this action, until all acts agreed to be performed under the Stipulation of Settlement shall have been performed and the final order of dismissal referenced above has become effective or until October 1, 1996, whichever occurs latest.

84 F.3d at 369.

At issue in the contempt order litigation, Consumers Gas contended that Farmland Industries had violated the district court's order because it had contravened a provision in the Stipulation of Settlement. Specifically, a provision in the Stipulation of Settlement read: "[t]here

shall be no press release and no communication with the media concerning the settlement of this Action, or concerning the Action itself, except a joint release to be approved by both Class Counsel and Defendant Farmland on or before July 7, 1993."  84 F.3d at 368-69.  In alleged violation of this provision, Farmland Industries later published an article in its corporate newsletter about the original litigation, and Consumers Gas moved for civil contempt. 84 F.3d at 369.  After issuing an order to show cause and holding a hearing, the district court "concluded the section of the stipulation prohibiting communications to the media was part of the district court's order, and Farmland breached it by discussing the case in its corporate newsletter."  84 F.3d at 369.  The district court imposed sanctions and ordered Farmland Industries to pay Consumers Gas' fees and costs related to the contempt proceedings, and also ordered Farmland Industries to publish various notices and apologizes in its corporate newsletter.  See 84 F.3d at 369.

The Tenth Circuit found error in the district court's issuance of the contempt order.  4 F.3d at 371-72.  First, the Tenth Circuit distinguished Kokkonen, 511 U.S. 375, because it observed that Kokkonen concerns "a jurisdictional question: whether a federal district court has 'inherent power' or 'ancillary jurisdiction' to enforce a dismissal-producing settlement agreement.  Kokkonen holds that a court lacks subject matter jurisdiction to enforce a settlement absent an independent jurisdictional basis or a reservation of jurisdiction in the order dismissing the action."  Consumers Gas & Oil, 84 F.3d at 370.  Contrary to this jurisdictional analysis, the Tenth Circuit in Consumers Gas & Oil focused its analysis on rule 65(d) of the Federal Rules of Civil Procedure, which deals with the mandatory contents of injunctions and restraining orders.  See Fed. R. Civ. P. 65(d)(1)(A)-(C) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe

in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required.").

The Tenth Circuit in <u>Consumers Gas & Oil</u> observed that rule 65(d) requires a sufficient degree of specificity for any court order that commands or prevents an action.  <u>See</u> <u>Consumers Gas & Oil</u>, 84 F.3d at 370-71.  <u>See also</u> 11A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 2955 (3d ed. 2023)("The Supreme Court has indicated that the term 'injunction' in Rule 65(d) is not to be read narrowly but includes all equitable decrees compelling obedience under the threat of contempt.")(source of quoted material not cited).  Based on the facts at issue, the Tenth Circuit observed: "Farmland allegedly violated a term of a settlement agreement approved by a judicial order," but that, "[s]tanding alone, a settlement agreement is nothing more than a contract; the imprimatur of an injunction is required to render it a consent decree enforceable through contempt."  84 F.3d at 370 (quoting <u>D. Patrick, Inc. v. Ford Motor Co.</u>, 8 F.3d 455, 460 (7th Cir. 1993)).  The Tenth Circuit concluded that, although the district court's order stated that "the Court reserves continuing jurisdiction over the implementation and enforcement of the terms of the Stipulation of Settlement," that provision "did not expressly set forth the provision prohibiting communications to the media."  <u>Consumers Gas & Oil</u>, 84 F.3d at 371.  Accordingly, "[s]ince the district court did not expressly set forth the prohibition, it may not be enforced by contempt."  84 F.3d at 371.

This conclusion relied, in large part, on the Tenth Circuit's adoption of a "strict[]" reading of rule 65(d), which the Tenth Circuit reasoned "give[s] effect to its plain, mandatory language."  84 F.3d at 371.  The Tenth Circuit noted that rule 65(d) requires an injunction to "describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  <u>See</u> <u>Consumers Gas & Oil</u>, 84

F.3d at 370-71.  A strict reading of this command, according to the Tenth Circuit, "protects those who are enjoined by informing them of the specific conduct regulated by the injunction and subject to contempt."  84 F.3d at 371.  Following from rule 65(d)(1)(C)'s prohibition against incorporation by reference for the purpose of injunctions, the Tenth Circuit quoted approvingly a statement from the United States Court of Appeals for the Seventh Circuit, which "held that a provision of a settlement agreement not explicitly set forth in a judicial order is not enforceable by contempt."  Consumers Gas & Oil, 84 F.3d at 371 (citing H. K. Porter Co. v. Nat'l Friction Prod. Corp., 568 F.2d 24, 27-28 (7th Cir. 1977)).  The Tenth Circuit also noted that the Seventh Circuit, similarly, also has held that "merely retaining jurisdiction to enforce the agreement is not enough to transform it into an order enforceable by contempt."  Consumers Gas & Oil, 84 F.3d at 371 (citing D. Patrick, Inc. v. Ford Motor Co., 8 F.3d at 461).

The Court concludes that the principles of Consumers Gas & Oil preclude the Court's use of its contempt power to enforce the Settlement Agreement.  As a preliminary -- and ultimately dispositive -- matter, as discussed above, see supra Section I(A), the Settlement Agreement in this case is not incorporated into the Consent Judgment or any other Court order.  As a result, there is no "valid court order" on which a finding of contempt could be based.  Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d at 1315.  Moreover, under Consumers Gas & Oil, even if the Consent Judgment had stated that the Court "reserves continuing jurisdiction over the implementation and enforcement of the terms of the" Settlement Agreement -- as occurred in Consumers Gas & Oil -- such an assertion of jurisdiction would not be sufficient to justify a use of the Court's contempt power under rule 65.  Consumers Gas & Oil, 84 F.3d at 369.  The Tenth Circuit's "strict[]" reading of rule 65 -- and, specifically, rule 65(d) -- mandates that any injunctive order must "describe in reasonable detain, *and not by reference to the complaint or*

*another document*, the act or acts sought to be restrained." Consumers Gas & Oil, 84 F.3d at 371 (citing Fed. R. Civ. P. 65(d)(1)(C))(emphasis in Consumers Gas & Oil, but not in rule 65). Accordingly, even if the Settlement Agreement were somehow incorporated into the Consent Judgment, the Consent Judgment does not set forth expressly the information in provisions 1(a) and 1(b) of the Settlement Agreement. Under the Tenth Circuit's strict interpretation of rule 65, therefore, the Court cannot enforce those provisions of the Settlement Agreement under its contempt power. See Consumers Gas & Oil, 84 F.3d at 371-72.

To conclude, the Court denies the Motion, because the provisions at issue in this most recent iteration of this litigation -- namely, in provisions 1(a) and 1(b) of the Settlement Agreement -- are not part of any court order, and thus the Court may not enforce these provisions via its contempt power.

**IT IS ORDERED** that the Defendant/Counter-Claimant's Motion for Order to Show Cause and to Enforce Settlement Agreement, filed September 28, 2023 (Doc. 99), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Frank Lupo
Mia Napolitano
  Attorney Advisors
Office of the Solicitor
Southwest Region
Department of Interior
Albuquerque, New Mexico

-- and --

Alexander M.M. Uballez

United States Attorney
Roberto D. Ortega
Howard R. Thomas
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff/Counter-Defendant*

Ernest L. Padilla
Padilla Law Firm, PA
Santa Fe, New Mexico

-- and --

Christina S. West
Tierra Marks
Barnhouse Keegan Solimon & West LLP
Los Ranchos de Albuquerque, New Mexico

*Attorneys for the Defendant/Counter-Claimant*